UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: KITTS DEVELOPMENT, LLC,                  No. 11-11-14054 JA

Debtor.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the First and Final Application by Attorneys for Debtor-in-Possession for Allowance and Payment of Compensation as a Chapter 11 Administrative Expense for the Period September 13, 2011 through January 20, 2012 ("Fee Application") filed by the law firm of William F. Davis & Assoc., P.C. ("Attorneys") as counsel for Kitts Development, LLC ("Kitts Development," "Kitts," or the Debtor). *See* Docket No. 87. The United States Trustee objected to the Fee Application (Docket No. 90), and, following a final, evidentiary hearing on the Fee Application held June 11, 2012, the Court took the matter under advisement.

Attorneys seek allowance as an administrative expense the sum of $21,187.83, consisting of post-petition professional services in the amount of $19,584.00, costs and expenses in the amount of $232.91, and applicable gross receipts taxes in the amount of $1,370.82. Of the $30,000.00 retainer received by the Attorneys from Kitts Development, $1,534.71 currently remains held in the Attorneys' trust account. *See* Fee Application, ¶ 1.[1] The Debtor's bankruptcy case ended in dismissal in conjunction with stay relief granted to U.S. Bank National Association ("U.S. Bank"), the Debtor's largest creditor. *See* Docket Nos. 80 and 81. The United States Trustee challenges the reasonableness of the requested fees on grounds that the fees were not reasonably likely to benefit the debtor's estate, arguing that the surrounding facts

---

[1] Pre-petition fees in the amount of $14,058.34 were earned and paid in full prior to the filing of the Debtor's bankruptcy case. *See* Fee Application, ¶ 1. The United States Trustee did not object to the pre-petition fees and costs. *See* United States Trustee's Objection to First and Final Application by Attorneys for Debtor in Possession ("Objection"), p. 5, n.3. (Docket No. 90).

and circumstances amply suggested that the Debtor had no reasonable prospect of reorganizing in a reasonable time. After consideration of the Fee Application, the evidence, and the testimony presented at the final hearing, and being otherwise sufficiently informed, the Court finds that, at the time the case was filed, and throughout the Attorneys' representation of the Debtor in the Chapter 11 case, there existed a reasonable possibility of success in the bankruptcy case sufficient to meet the standard for an award and payment of compensation under 11 U.S.C. § 330.

## FACTS

Kitts Development filed a voluntary petition under Chapter 11 of the Bankruptcy Code on September 13, 2011. The Debtor's Schedule A reflects the following real property: Puerto Del Sol Project - 14 partially built 4-unit buildings; 18 improved 4-unit building lots; 1 corner commercial lot (the "Property," or "Puerto del Sol"). The Debtor scheduled a value of $1,200,000.00 for the Property. In a motion for relief from stay, U.S. Bank asserted that the "Property is worth no more than $1.2 million." *See* Docket No. 20. The Property consists of approximately 9.9 acres and is located off of Unser Boulevard between Southern Boulevard and Northern Boulevard in Rio Rancho, New Mexico. The Debtor's Schedule D reflects that U.S. Bank holds a secured claim against the Property in the amount of $10,350,032.44. The Debtor's Schedule B reflects personal property in the aggregate total amount of $185,261.98. The Debtor's scheduled unsecured non-priority claims totaled over $1,000,000.00.

Pre-petition, U.S. Bank had obtained a final judgment against Kitts Development, and its principal, Thomas G. Joseph, in the principal amount of $8,468,087.03, plus interest, late fees and loan fees. *See* UST-Exhibit 3. The judgment provided for foreclosure of U.S. Bank's mortgage against the Property, and directed that the Property be sold by a special master. *Id.*

2

U.S. Bank scheduled a foreclosure sale for September 14, 2011. *See* UST- Exhibit 4. Kitts Development filed its bankruptcy case the day before the scheduled sale.

The Attorneys had several meetings with Thomas Joseph, president of Kitts Development, prior to the filing of the bankruptcy case. Mr. Davis testified that Mr. Joseph led him to believe that with sufficient time, it would be possible to reorganize Kitts Development and make money for the estate, that Kitts had located an interested investor, and that they were close to reaching an agreement. Mr. Davis testified that there were three possible approaches for the Debtor in the Chapter 11 case: 1) investors would refinance Kitts' indebtedness to U.S. Bank and put money in Kitts to redevelop the project as originally envisioned; 2) investors would purchase from U.S. Bank the notes made by Kitts payable to U.S. Bank; or 3) investors would buy the Property from U.S. Bank. Mr. Joseph had been seeking potential investors for two years prior to the filing of the bankruptcy case and while the foreclosure suit was moving forward, without success. But by the end of July of 2011, Mr. Joseph communicated to the Attorneys a summary of a potential agreement reached with Myriad Group and G6 Development, LLC. *See* Exhibits C and D. An e-mail communication from Myriad Group includes the following information about the terms of the potential agreement:

- that Myriad Group and its principle [sic.], Jonathan Lee, is attempting to purchase notes and mortgages from US Bank;

- that Puerto Del Sol is the collateral for the notes;

- that the Myriad Group will foreclose the property to obtain a clear title;

- that the Myriad Group will enter into a management agreement with G6 Development, LLC to complete the project and finish all site work, including infrastructure;

- that the Myriad Group will provide all the money necessary to finish the project and G6 Development, LLC will manage the project;

3

- that the corner commercial lot will be used as part of the funds needed to buy the notes from US Bank, but if such lot is not used, the Myriad Group and G6 Development will own the lot jointly;

- that once the Myriad Group completes the purchase of the notes from U.S. Bank, full compensation will be due to G6 Development, LLC; and

- that G6 Development, LLC will have 50% ownership in the corner commercial lot.

*See* Exhibit D.

As requested by Mr. Joseph, the Attorneys prepared a draft Construction Management Agreement (the "Draft Agreement") between Myriad Group, Inc. ("Myriad Group"), as buyer, and G6 Development, LLC, as manager, regarding Myriad Group's pursuit of purchasing from U.S. Bank the mortgage on the Property and the related promissory notes. *See* Exhibit E. G6 Development, LLC is a limited liability company for which Thomas Joseph's son, Gabriel Joseph, is principal. *Testimony of Mr. Joseph.* The Draft Agreement reflects that Thomas Joseph is managing member of G6 Development, LLC. *See* Exhibit E. The Draft Agreement provides that Myriad Group would refinance the mortgage to U.S. Bank currently in the name of Kitts Development, and forgive Kitts Development's obligations under the notes. G6 Development, LLC would receive a construction management fee of $2,000,000. The Draft Agreement provides further that the corner commercial lot would be sold to purchase the promissory notes from U.S. Bank, and that Myriad Group would receive ½ of Kitts Development's interest in the corner commercial lot. *Id.* Alternatively, the corner lot would be pledged to U.S. Bank as collateral for the purpose of refinancing the mortgage. *Id.* Kitts was not able to complete a deal with Myriad Group.

Post-petition, Kitts Development, through Mr. Joseph, continued to seek potential investors who might be interested in purchasing the notes and mortgage against the Property from U.S. Bank. Mr. Joseph continued to send communications to the Attorneys regarding

4

potential investors. *See, e.g.,* e-mail dated October 20, 2011 from Thomas Joseph to William Davis (Exhibit G), stating that "Lance Cone will make the offer . . . . Once his offer is in place I'll work on the group from Canada as well as others. . . . I would like to bring Lance in to talk with you about his role."; e-mail dated December 9, 2011 from Thomas Joseph to William Davis (Exhibit J), regarding potential interest of Russell Oates at First Service Commercial Loans and Rick O'Brien from another group in purchasing the note.   In December of 2011, Mr. Joseph sent Mr. Davis an e-mail with a breakdown of estimated income and costs, stating that "this plan generates $700,000 in income for the creditors, bank and unsecured," but that "the cost of completing infrastructure negates income from the sale of 18 lots," and that "the profit wouldn't justify the risk in this particular type of project." Exhibit H.   The following day, Mr. Joseph sent Mr. Davis a revised cash flow projection for construction and revenue relating to the Property. *See* Exhibit I.  That scenario included U.S. Bank giving a substantial discount on its claim and payment of $150,000.00 to unsecured creditors.  Kitts Development was never able to secure a buyer for the notes, and never obtained a signed proposal from an investor or lender.

     Mr. Joseph testified at the final hearing that in order to move forward with a potential redevelopment of the Property through investors, he believed that an appraisal was needed so that the value of the Property could be established, and that, without an appraisal, there would be no chance to go forward or succeed at anything.   Kitts Development did not obtain an appraisal of the Property during the pendency of the bankruptcy case.   Nor did Kitts Development obtain an appraisal before the filing of the bankruptcy case.  It is possible that potential investors would have obtained an appraisal of the Property on their own.    Mr. Davis testified that the issue of an appraisal did not come up prior to the filing of the bankruptcy case.   After the bankruptcy case was filed, Mr. Davis believed that an appraisal would be useful in conjunction with a plan of

reorganization, not as a necessary requirement to induce investors to purchase the notes. He believed that investors who had already been negotiating with Kitts Development prior to the filing of the bankruptcy case probably would have already obtained an appraisal if they wanted one.

On October 24, 2011, approximately six weeks after Kitts Development filed its bankruptcy case, U.S. Bank filed a Motion to Dismiss, a Motion for Relief from Stay, and a Motion for Determination that the Debtor is Subject to 11 U.S.C. § 362(d)(3) (together, the "Motions"). *See* UST Exhibit 2. On January 20, 2012, the Court entered an order granting Attorneys' motion to withdraw as counsel for the Debtor.[2] At the final hearing on the Motions held on February 7, 2012,[3] the Court made the following findings:

> a) that the Debtor has no equity in the Property and the Property is not necessary to an effective reorganization;
>
> b) that the Property is substantially all of the property in the Debtor's bankruptcy estate;
>
> c) that it is a particular challenge for a debtor to get a plan confirmed where the amount of the secured debt is nearly ten times the value of the collateral;
>
> d) that where the lender is so under-collateralized, it would be difficult for a debtor to convince the Court to grant a lien for new money with seniority over U.S. Bank's lien;
>
> e) that it would be difficult for a debtor to obtain financing by granting a junior lien where there is no equity in the collateral for the debtor;

---

[2] After the bankruptcy case was filed, the Attorneys' relationship with Kitts Development's principal, Thomas Joseph, deteriorated to the point that the Attorneys sought to withdraw as counsel of record for the Debtor. *See* Docket No. 50. The Court granted the Attorneys' motion to withdraw as counsel after notice and a hearing, and continued the final hearing on U.S. Bank's pending motions from January 20, 2012 to February 7, 2012 to afford the Debtor a further opportunity to retain new counsel. *See* Order Vacating and Rescheduling Hearing on Pending Motions Filed by U.S. Bank and Amending Scheduling Deadlines – Docket No. 57; and Order Granting Motion of William F. Davis & Assoc., P.C. to Withdraw as Counsel for Debtor – Docket No. 58.

[3] Kitts Development did not appear at the final hearing because it was unable to retain new counsel. By local rule, a debtor corporation or limited liability company is required to appear before the Court through counsel. *See* NM-LBR 1074-1.

    f) that there has been no suggestion that the Debtor was in a position to raise equity capital;

    g) that the exclusivity period set forth in 11 U.S.C. § 1121(b) for the Debtor to file a plan of reorganization expired and the Debtor had not filed a plan; and

    h) that the Debtor has no reasonable prospect of reorganizing this case within a reasonable time.

*See* Transcript of Court's Ruling from Hearing held February 7, 2012 - UST – Exhibit 1. The Court granted U.S. Bank's Motion for Relief from Stay and dismissed the Debtor's bankruptcy case, noting that, having granted relief from the automatic stay, "there is really nothing productive at this point that the Debtor could potentially accomplish by remaining in Chapter 11." UST – Exhibit 1, p. 8, lines 17 - 19.

  Jeffery Speidel, who was qualified as an expert in commercial development for loan and investment purposes inside and outside the bankruptcy context, testified on behalf of the United States Trustee at the final hearing on the Fee Application. He testified that the Property has several buildings on it, but that it appears the Property has been abandoned, that many of the buildings have been vandalized, and that it would take a lot of refurbishment to get the Property into a saleable condition. In his opinion, he would not recommend to a bank redevelopment of the Property unless there were some substantial paydown on the notes, and that it appeared to him that U.S. Bank "overfunded" the loan based on the percentage completion of the project. Based on his projected cost to complete the project, which was premised on a national average cost per unit for apartment units, Mr. Speidel opined that there would need to be a significant discount on the loan to make the project feasible. In making his calculations, Mr. Speidel made no adjustments to the national average per unit sales price to account for the nature or quality of the improvements, locality, or otherwise. Nor did Mr. Speidel's calculations consider the corner commercial lot on the Property. When posed with a hypothetical scenario whereby an investor

7

would be willing to pay $5,000,000 to purchase a $10,000,000 loan from U.S. Bank secured by Property having a market value of $1,500,000, Mr. Speidel testified that he would have to present such a proposal to the committee at the bank. When pressed as to whether he would recommend that type of arrangement, he ultimately agreed that if an investor actually paid $5,000,000 for the notes, he would recommend the sale.

      The billing records submitted by the Attorneys in support of the Fee Application reflect several pre-bankruptcy client meetings; research concerning standing to enforce promissory notes after sale by the Federal Deposit Insurance Company as receiver for an insolvent bank; preparation of statements and schedules; attendance at meeting of creditors; preparation and review of monthly operating reports; research relating to defense of a motion for relief from stay; communication with counsel for U.S. Bank regarding the motion for relief from stay and motion to dismiss; post-petition communications with the Debtor; preparation of an application to employ appraiser; preparation of the motion to withdraw as counsel for the Debtor; and preparation of the Fee Application. The Billing Summary reflects that a total of $8,141.50 in attorneys' fees was billed for work relating to Chapter 11 Administration, and $4,740.00 in attorneys' fees was billed for work relating to a plan and disclosure statement. The work relating to the plan and disclosure statement from the January 2012 billing statement is described as follows: review of e-mails sent by Mr. Joseph; telephone conferences with Mr. Joseph; telephone conferences with Mr. Joseph and potential investors. The Debtor never filed a disclosure statement, and never filed a plan of reorganization. At the time the Debtor's bankruptcy case was dismissed, the exclusivity period within which the Debtor could have filed a plan had expired.

8

DISCUSSION

<u>The Standards for Awarding Compensation to Counsel for a Chapter 11 Debtor in Possession</u>

Attorney compensation is governed by 11 U.S.C. § 330, which provides that counsel for the Debtor may be awarded "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A) and (B). The Court has discretion to award compensation less than the amount requested. 11 U.S.C. § 330(a)(2). The party seeking an award of compensation bears the burden of demonstrating that the services provided were actual, necessary, and beneficial to the estate.[4] Compensation cannot be awarded in a Chapter 11 case for services that were neither "reasonably likely to benefit the debtor's estate" nor "necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A)(ii)(I) and (II). *See also, In re Lederman Enterprises, Inc.,* 997 F.2d 1321, 1323 (10th Cir. 1993)(stating that "[a]n element of whether the services were 'necessary' is whether they benefitted the bankruptcy estate.")(citations omitted).

In *Lederman Enterprises,* the Tenth Circuit determined that in a Chapter 11 case a court's assessment of fees under 11 U.S.C. § 330 requires a two- step process: 1) the court must first determine whether the post-petition services are necessary, *i.e*, whether the services were reasonably likely to benefit the estate; and 2) if so, were the services reasonable. *See Lederman,* 997 F.2d at 1323 (stating that "the beneficial nature of legal services must be determined before a reasonableness inquiry may be conducted . . ."). Thus, in a Chapter 11 case, whether the services benefitted the estate and therefore were necessary is a threshold requirement; if

---

[4]*In re Smith,* 317 F.3d 918, 928 (9th Cir. 2002)("the fee applicant must demonstrate that the services for which compensation is sought satisfy the requirements of section 330 . . . "), *abrogated on other grounds by Lamie v. United States Trustee,* 540 U.S. 526, 531-39, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *In re Berg,* 268 B.R. 250, 257 (Bankr.D.Mont. 2001)("The burden of proof to show entitlement to all fees requested from the estate is on the applicant.")(citation omitted).

counsel's services conferred no likely benefit to the estate, the fees are not compensable. *See In re Universal Factoring Co., Inc.,* 329 B.R. 62, 78-79 (Bankr.N.D.Okla. 2005)(stating that *Lederman* established a threshold requirement and explaining further that "[u]nless the court determines that a service was reasonably likely to confer a benefit upon the estate, the inquiry goes no further, and the fees are not compensable."). In *Lederman,* the Tenth Circuit affirmed the bankruptcy court's decision to deny compensation to debtor's counsel, reasoning that, because the debtor's inability to successfully develop and complete a reorganization plan should have been apparent to counsel for the debtor from the outset of the case, the work debtor's counsel performed was not necessary. *Lederman,* 997 F.2d at 1323-1324.

"Benefit" to the estate is measured in part by considering "whether the services were necessary to the administration of, or beneficial at the time which the service was rendered, toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C)(setting forth factors for determining the reasonableness of compensation); *Universal Factoring,* 329 B.R. at 79. Benefit to the estate should be measured as of the time the services are provided, not at the time the Court ultimately reviews the fee application.[5] Fees that benefit the debtor, but not the estate in a Chapter 11 case, are not compensable.[6]

Benefit to the estate for services provided by counsel for a Chapter 11 debtor in possession is not restricted to success measured by confirmation of a plan or the prospect of

---

[5] *In re Polishuk,* 258 B.R. 238, 248 (Bankr.N.D.Okla. 2001)(citing *In re City Mattress, Inc.,* 174 B.R. 23, 26 (Bankr.W.D.N.Y. 1994) stating that "'[t]he key issue is whether the services were necessary, not whether the debtor's activities were, in hindsight, necessary to achieve whatever outcome eventually occurs."). *See also, Berg,* 268 B.R. at 260 (same).

[6] *See In re Kloubec,* 251 B.R. 861, 864 (Bankr.N.D.Iowa 2000("Attorney fee applications for debtors' attorneys in bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not benefit the bankruptcy estate.")(citation omitted); *In re Greene,* 138 B.R. 403, 408 (Bankr.S.D.N.Y. 1992)(stating that "fees awarded to an attorney for the debtor are determined in the light of the benefits those services produced for or in connection with the estate only, because fees are not allowed for services that benefit the debtor but not the estate.")(citations omitted).

10

confirming a plan.[7] For example, a Chapter 11 debtor can benefit the estate by maximizing value for creditors through an orderly or emergency liquidation of assets by Section 363 sales, even if the Chapter 11 case ultimately is converted or dismissed. Nor is benefit to the estate restricted solely to monetary benefit. *In re Crown Oil,* 257 B.R. 531, 540 (Bankr.D.Mont. 2000)(citing *In re Kohl,* 95 F.3d 713, 715 (8th Cir. 1996)(remaining citation omitted). Nevertheless, whether a Chapter 11 debtor confirms a Chapter 11 plan remains a relevant factor for the Court to consider when considering whether the services provided a benefit to the estate. *In re Kile,* 345 B.R. 182, 190 (Bankr.D.Ariz. 2004)(citing *Crown Oil,* 257 B.R. at 541)). Some courts have reduced, but not disallowed in full, an application for compensation where counsel's services promoted the bankruptcy process and contributed to the administration of the estate, but did not otherwise provide a benefit to the estate and the case ultimately converted from Chapter 11 to Chapter 7.[8]

Here, the United States Trustee argues that it should have been patently obvious to the Attorneys that the Debtor would not be able to achieve success through a plan of reorganization, given the fact that the scheduled amount of U.S. Bank's secured claim was more than ten times greater than the Debtor's stated value of the Property on its schedules. The United States Trustee relies, in part, on the Court's findings made on the record of the hearing on U.S. Bank's Motion to Dismiss and Motion for Relief from Stay, including the Court's statement that, at that stage in the bankruptcy case, there was really nothing productive that the Debtor could accomplish in

---

[7] *See Berg,* 268 B.R. at 261 (stating that "[t]he fact that the Chapter 11 Plan was ultimately not confirmed does not, by itself, bar recover of compensation for services performed in the Chapter 11 case.")(citing *Crown Oil,* 257 BR. at, 541). *See also, City Mattress,* 174 B.R. at 26 ("Confirmation of a reorganization plan has never been a precondition for the allowance of legal fees.").

[8] *See, e.g., Berg,* 268 B.R. at 262 (allowing compensation for services provided by debtor's counsel to prepare and compile the debtor's statements and schedules, while acknowledging that the court had the discretion to deny all requested fees and costs in a doomed Chapter 11 case that resulted in conversion to Chapter 7); *In re Old South Transp. Co., Inc.,* 134 B.R. 660, 663-666 (Bankr.M.D.Ala. 1991)(reducing the amount of allowed compensation to attorneys for debtor in possession in light of limited results obtained; debtor's Chapter 11 reorganization efforts failed yet counsel allowed the debtor to continue in Chapter 11 when there was no longer any likelihood of a successful reorganization).

11

Chapter 11. These statements are not binding on the Attorneys because they did not appear at the hearing and had no reason to believe they needed to appear to protect approval of their compensation. The Court's conclusions were made in an uncontested hearing on limited evidence. Consequently, the Court will not give preclusive effect to its findings made in its ruling on the Motion to Dismiss and the Motion for Relief from Stay for purposes of evaluating the Attorneys' Fee Application.[9]

"Benefit" Requires a Reasonable Possibility of Success in the Bankruptcy Case

Benefit to the estate does not require that the debtor actually achieve success. Giving the debtor the opportunity to achieve something beneficial to the estate can benefit the estate even if the attempt is not successful. In unsuccessful Chapter 11 cases, Courts have articulated similar, but not identical, descriptions of what is required to satisfy the "benefit" requirement for compensation from the estate. For example, in *Lederman,* the Tenth Circuit cited cases for the propositions that compensation should be disallowed if "counsel knew or should have known that reorganization was never a **viable possibility**,"[10] and that compensation should be

---

[9] Issue preclusion, or collateral estoppel, whereby issues of ultimate fact determined by a valid final judgment entered in a prior proceeding are binding in a subsequent proceeding, includes the requirement that "the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *United States v. Rogers,* 960 F.2d 1501, 1508 (10th Cir. 1992)(quoting *Matter of Lombard,* 739 F.2d 499, 502 (10th Cir. 1984)). Generally, "a default judgment entered in a federal court will not support the application of collateral estoppel." *In re Sukut,* 357 B.R. 840, 844 (Bankr.D.Colo. 2006)(citing *Arizona v. California,* 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000)(remaining citations omitted). The Court also declines to apply the law of the case doctrine, which requires that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case,'" because the rule of law decided in the Motion to Dismiss and Motion for Relief from Stay is not the same rule of law that the Court is now asked to decide. *In re Straight,* 248 B.R. 403, 414 (10th Cir. BAP 2000)(quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), *quoted in Stifel, Nicolaus & Co. v. Woolsey & Co.,* 81 F.3d 1540, 1543 (10th Cir. 1996)). Moreover, the United States Trustee did not expressly raise the law of the case doctrine, and, as stated earlier, neither the Debtor nor the Attorneys participated in the hearing. The "law of the case doctrine is not an 'inexorable command' but a rule to be applied with good sense." *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1553 (10th Cir. 1991)(citing *Major v. Benton,* 647 F.2d 110, 112 (10th Cir. 1981)).

[10] *Lederman,* 997 F.2d at 1324 (citing *Miner & Westergren, Hauptman, O'Brien, Wolfe & Hadley, P.C. (In re King),* 96 B.R. 206, 208 (Bankr.W.D.Mo. 1989)(emphasis added). *See also, In re MFlex Corp.,* 172 B.R. 854, 857 (Bankr.W.D.Tex. 1994)(same).

12

disallowed if the case was filed **"without any reasonable prospect of success**".[11] Another articulation of the standard is whether "there was a **reasonable chance of success** which outweighed the cost of pursuing the action." *In re Jefsaba, Inc.,* 172 B.R. 786, 789 (Bankr.E.D.Pa. 1994)(emphasis added).[12] Several courts have determined that to benefit the estate, the services must relate to a "**realistically obtainable goal**," meaning that there must be a realistic hope of obtaining the goal.[13] Still another articulation of the standard is that "the endeavor for which the estate is expected to pay must be **reasonably calculated to produce a benefit to the estate**." *In re Hunt,* 124 B.R. 263, 267 (Bankr.S.D.Ohio 1990)(emphasis added).

Elsewhere in the Bankruptcy Code a similar standard exists for determining whether stay relief should be granted with respect to an act against a single asset real estate: stay relief will be granted unless "the debtor has filed a plan of reorganization that has a **reasonable possibility** of being confirmed within a reasonable time." 11 U.S.C. § 362(d)(3)(A) (emphasis added). This Court believes that "benefit" to the estate for purposes of determining whether compensation should be awarded to debtor's counsel in a Chapter 11 case should be measured by whether there is a reasonable possibility of achieving success in the bankruptcy case that will benefit the estate. This standard 1) protects creditors and other parties in interest from the delay and expense of bankruptcy cases where nothing productive realistically can be attained consistent with the purposes and policies underlying the Bankruptcy Code; 2) protects counsel acting reasonably and in good faith from the draconian prospect of disallowance of all fees; and 3) protects parties

---

[11] *Lederman,* 997 F.2d at 1324 (citing *New York Credit Men's Adjustment Bureau, Inc. v. Ballon, Stoll & Itzler ( In re Casco Fashions, Inc.)*, 490 F.2d 1197, 1204 (2d Cir.1973)(emphasis added).
[12] *Accord, Berg,* 268 B.R. at 261.
[13] *See Polishuk*, 258 B.R. at 248-49 ("In order to benefit the estate, the services rendered must relate to a realistically obtainable goal. Counsel for a debtor or debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation.")(citations omitted). *Accord Universal Factoring Co., Inc*., 329 B.R. at 79 ("to benefit the estate, the services rendered must relate to a realistically obtainable goal."). *Cf. In re Phillips*, 291 B.R. 72, 82 (Bankr S.D. Tex. 2003)(applying "realistically obtainable goal" standard to counsel for Chapter 13 debtor).

13

in financial distress seeking bankruptcy relief from the chilling effect that application of an overly strict standard would have on attorneys being willing to undertake representation of debtors in possession.

### The Attorneys' Services Provided a Benefit to the Estate

There was a reasonable possibility that the Debtor could achieve a benefit to the estate through a plan of reorganization that provided for an investor's purchase of the notes and mortgage from U.S. Bank at a steep discount and funding the completion of construction of the Property, with funds also made available for distribution to unsecured creditors. This was one of the strategies motivating the Attorney's and Debtor's decision to commence the Chapter 11 case.

Shortly prior to commencement of the Chapter 11 case, the Debtor engaged in negotiations with Myriad Group toward reaching a deal for purchase of the notes and completion of construction, which reached the stage of a draft agreement. After commencement of the Chapter 11 case, the Debtor engaged in discussions with First Service Commercial Loans, Lance Cone, and Rick O'Brien from another group interested in purchasing the notes and mortgage. Mr. Joseph assured the Attorneys that the Debtor had a realistic prospect of reaching an agreement with an investor regarding the investor's purchase of the notes and mortgage from U.S. Bank. Post-petition, the Debtor prepared a cost analysis for an investor purchasing the notes and mortgage from U.S. Bank and funding completion of the construction of the Property that yielded a return to unsecured creditors.

The evidence also suggests that U.B. Bank realistically may have been willing to sell the notes and mortgage to an investor at a steep discount. U.S. Bank itself acknowledged, post-petition, that its collateral was worth no more than about 10% of the amount of its claim secured by the Property, that the Property was in various stages of development, and that improvements

14

on the Property had deteriorated since construction and had been vandalized. *See* Motion for Relief From Stay - Docket No. 20. It is reasonable to conclude that a bank faced with adding 14 partially built 4-unit buildings to its real estate owned having a value of 10% of the loan balance, and with the cost of insuring and securing the vandalized units pending disposition of the loan or collateral, would seriously entertain offers to buy the loan at a steep discount from face.

Mr. Joseph testified that the Debtor should have procured an appraisal as the first step towards securing investors and moving through the bankruptcy process, and that he urged the Attorneys that the Debtor should obtain such an appraisal to no avail. The Attorneys argued that an appraisal of the Property "as is" would not have been useful in the bankruptcy case, and that an appraisal would only have value if it could be used in conjunction with a plan of reorganization and included an estimated value of the Property upon completion of the project. The Court will not second guess the Attorneys' strategy regarding an appraisal. Mr. Joseph had been seeking investors for Kitts for some two years prior to commencement of the Chapter 11 case. If he thought Kitts obtaining an appraisal was essential to it attracting an investor, Kitts reasonably would have ordered an appraisal during that 2-year period. Further, it is likely that U.S. Bank would want to order its own appraisal to give it a basis to evaluate offers to purchase the loan.

The Debtor's bankruptcy case was pending from September 2011 through February 2012, a period of approximately five months. During that time, no plan or disclosure statement was filed. However, the billing statements reflect that certain steps were taken toward formulating a plan and hiring an appraiser. Ultimately, none of these efforts were fruitful. "Buying time," in and of itself, is not a sufficient benefit to the estate. *See Greene,* 138 B.R. at 409 (finding that the continuation of the Chapter 11 case "was simply a delaying action intended to stall [the

15

debtors' largest creditor] from foreclosing on [the debtors'] home"; consequently, counsel's efforts in resisting conversion benefitted the debtors only, not the estate, and could not be compensated from the estate); *Crown Oil,* 257 B.R. at 543 (debtor's counsel "should not be rewarded for stringing a bad case out for a lengthy period of time.")(citing *In re Central Florida Metal Fabrication, Inc.,* 207 B.R. 742, 751 (Bankr.N.D.Fla. 1997)). Nevertheless, the Court finds that the Attorneys' services were necessary, because, at the time such services were rendered, there was a reasonable possibility of achieving success in the Chapter 11 case during the period of delay resulting from the bankruptcy filing.

This finding of "benefit" is a close call. The Debtor faced an extremely difficult challenge. Absent a realistic possibility of procuring a prospective investor to buy the notes and mortgage from U.S. Bank and fund completion of construction, the Court agrees that there would be no reasonable possibility for success in the bankruptcy case, and the Attorneys would not be entitled to compensation. When debtor's counsel realizes, or should have realized, that a bankruptcy case has no reasonable possibility of success, counsel must also recognize that he has placed his own fees at risk. *See Kile,* 345 B.R. at 190 (stating that "'Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk.'")(citing *Crown Oil,* 257 B.R. at 541, quoting *In re Offield,* 128 B.R. 548, 550 (Bankr.W.D.Mo. 1991)). But here, the surrounding facts and circumstances support a finding that the Debtor had a reasonable possibility of success.

The Debtor was in active discussions with at least three potential investors, and the circumstances suggest that U.S Bank likely would have seriously entertained third party investor offers to purchase its loan at a steep discount. In addition, unlike the debtor in *Lederman*, this bankruptcy filing was the Debtor's first attempt (albeit, ultimately unsuccessful) at

16

rehabilitation.[14] Moreover, because the Debtor's bankruptcy case was dismissed, not converted, there no longer is a bankruptcy estate. *See* 11 U.S.C. § 349(b)(3)("dismissal . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title."). Thus the underlying rationale for disallowing fees that do not provide a benefit to the estate because of the "'unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors'" is not unduly frustrated. *Crown Oil,* 257 B.R. at 540 (quoting *Kohl,* 95 F.3d at 714)(quoting *In re Hanson,* 172 B.R. 67, 74 (9th Cir. BAP 1994)). Payment of the Attorneys' fees will not deplete the bankruptcy estate to the detriment of the Debtor's creditors, though, admittedly, the commencement of the bankruptcy did result in delay and expense to U.S. Bank. Finally, the Court notes that, if compensation were routinely disallowed when a debtor's reorganization efforts are unsuccessful, it "would create a chilling effect on the willingness of counsel to undertake the representation of debtors in financial distress and would likely deny access to the court to many deserving debtors." *In re Coastal Nursing Center, Inc.,* 162 B.R. 918, 919 (Bankr.S.D.Ga. 1993).

Based on the foregoing, the Court concludes that the Fee Application should be allowed. An order granting the Fee Application and allowing compensation and payment will be entered separately.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: June 26, 2012

---

[14]In *Lederman,* the same attorneys who represented the debtor in a prior bankruptcy case filed a second bankruptcy case for the debtor the day after the debtor's major creditor became entitled to immediate possession of its collateral under the terms of the confirmed plan in the original bankruptcy case. *Lederman,* 997 F.2d at 1322.

17

COPY TO:

**William F. Davis**
Fee Applicant
6709 Academy NE, Suite A
Albuquerque, NM 87109

**Alice Nystel Page**
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608